May it please the Court, my name is David Weikert, and along with Jessica Monk, who is at Council Table, we represent Petitioner, Appellant, Taxpayer, J. Paul Reddam. During the argument, I'll refer to Petitioner and Appellant interchangeably with Mr. Reddam. I do not intend to use my entire 15 minutes and probably will reserve a couple. This is a single-issue appeal. Did the Tax Court properly find that Mr. Reddam's offshore portfolio investment strategy must be disregarded because of lack of economic substance? I'm going to use the acronym OPUS throughout the hearing, but it should not be overlooked that OPUS was represented, marketed, portrayed, documented, and understood by the Appellant to be an investment strategy, a strategy with tax benefits to be sure. Let me ask you, let's assume that I agree with your argument that this is not, this doesn't fall under the Ninth Circuit sham transaction or lack of economic substance. Wouldn't we still have to remand this case to the Tax Court to determine whether or not the losses were real? In other words, the government made several arguments below, and the Tax Court accepted one of them. But I must tell you, even if I don't think this is a sham transaction or a transaction without economic substance, I can't imagine how your client had $40-something million of losses in this case when they only had $7 million at risk. So shouldn't, do we address that issue? Do we send it back to the Tax Court? Well, and you jumped to the end of my argument, Your Honor, because that was where do we go from here? If the Court — If you're right, where do we go from here? If I'm right, where do we go from here? If they're right, I know where we go from here. Right. I know the Court expressed skepticism on a couple of levels about aspects of the transaction and whether or not this basis shift was permissible under Section 302 and implicated other IRS regulations. Yeah. And just generally raised the 165 issue, which is whether or not you actually had an economic loss in this amount. You need to have an actual economic loss in order to take a loss. And I can deal with that argument, too, later on, because there are situations — Well, my first question is, should we reach those arguments? Yes. If we buy your other argument, we say the Tax Court was wrong, do we reach those arguments or do we send them back to the Tax Court to reach in the first instance? This is my gut. If the Tax Court really believed that it had another issue that would torpedo the legitimacy of this, it would have had that as a second basis for a judgment. Well, I don't think — That's not what the judge said. I understand that's not what the judge said. We hold that Petitioner's opus transaction lacked economic substance. Accordingly, our discussion focuses solely on the parties' contentions concerning the tax treatment. The remaining arguments by Respondent need not be addressed. Footnote, we do note that Respondent's arguments, blah, blah, blah, would warrant more exacting consideration under different circumstances. And then there's a little more to his footnote. But it suggests that he may think that there's some merit to some of these arguments, but doesn't need to get to them because there's one that clearly has merit in his view. And Your Honors have seen more situations than I have, obviously, since you review cases all the time aboard district judges. Well, more importantly, I try cases all the time. And if I can decide a case on one issue and not have to reach the other four, I will do it. Your Honor, then getting to the end issue, I think it goes back to the district court. If the court finds that this transaction had economic substance under the rules in the Ninth Circuit, then you remand it back to the district court for consideration of the other concerns to the tax court. Yeah, I'm sorry, to the tax court. Do you – is the Ninth Circuit view of this that different from, for example, the D.C. Circuit or the Third Circuit? I mean, this whole line of analysis started, I think, in the D.C. Circuit. And having gotten reversed after writing a 150-page opinion once, I kind of am sensitive about this. But is it a different, somewhat different analysis in the Ninth Circuit than it is in D.C. and the Third Circuit? I read the Court's lengthy opinion in BOCA. I read the fairly short response by the District of Columbia Circuit Court finding error in that. I think the Ninth Circuit is not that much different. But I think the Ninth Circuit is focused on the ball, to take a soccer analogy, which I think soccer is, at least in my children's past and in Judge Horowitz's past. They focus on whether or not there are economic effects apart from whatever loss, whatever deduction is claimed. So let me ask the question differently. If this case were in the D.C. Circuit, would you lose it? On this issue? If we had Judge Friedman at BOCA. Well, no. I'm trying to figure out whether you're asking. But if it went up, I totally disagree with the D.C. Circuit's opinion in ACS, and I disagree with the D.C. Circuit's opinion in BOCA. Well, but I'm asking a different question, I think, maybe slightly different question. And it's the one Judge Friedman asked, and maybe in a different way. Are you telling us that the Ninth Circuit law on this issue is different than that law of other circuits, or do you think that our law is consistent with the law of other circuits? I think the Ninth Circuit pays, addresses the same basic categories that other circuits do. I believe, though, that at the end of the day in the Ninth Circuit, the Ninth Circuit is focused on the one big question, which is whether or not there are economic effects. In the ACS and the BOCA cases, the court focused on whether or not they needed to use these partnerships in order to engage in the strategies involving the notes that were purchased. And that was the basis of reversal. The court found that you could make these investments the same way without using this partnership structure that was the basis of gaining the loss under the tax regulations. I don't think that's the law in the Ninth Circuit, nor do I think that should be the law, because the law says that if you are given two alternatives, one alternative that allows you to minimize tax and one alternative that doesn't allow you to minimize tax, you can choose the alternative that allows you to minimize tax. And if that means having a structure that involves partnerships, you should be able to do that. And this is just a personal anecdote, and it was reinforced in the car ride with Ms. Monk. My sister was born on December 21st. I was born on December 23rd. And it wasn't spring fever that motivated our births as of that time. My dad consistently said that the reason you were born in December around Christmas and had that horrible birthday where presents were combined was because he wanted that exemption. He didn't want to have to pay for me for the whole year. And Ms. Monk shared with me that one of her friends had a C-section on December 31st. And it struck me that I should have Googled how many C-sections are done on December 31st. The problem is you get the first part of the doctrine, which is a subjective belief, but I'm not sure what the independent economic gain of it is. But the point is this. The point is that someone can make a decision to choose a certain path. And in the D.C. Circuit, they criticized that transaction because they utilized a partnership structure that they asserted under the tax laws would allow them to take those losses. Let me ask you. In this case, we have the IRS's experts saying there's a 10 to 13 percent chance of a gain, this transaction. Your expert says 25 percent or so. Correct. What if the experts agreed there was only a one in a thousand chance of a gain? Would it then not be a sham transaction? Where do we draw the line? I don't want to draw the line. Well, I know. But we may have to. So help us. All right. And so you draw it. Obviously, you draw it at 13 percent. I'll take another couple of examples, Your Honor. In 2003, NBC ran a show about restaurants and the opening of restaurants. And during that television program, American Express ran an ad that said that one in every 10 restaurants failed. It was later debunked, and it was more that that was too negative a figure. But then if you go to, let's say, an economics class at Stanford, you'll learn that probably nine out of every 10 startups fail. So if someone was going to get involved in trying to defray some gains by investing in a business with the potential that they can glom on to some losses by investing in that business, whether some of those losses, those assets with embedded losses could be purchased, they could be looking at the startups knowing that there's only a one in 10 percent chance that I'm going to make money here. Yet that has absolute economic effects. That restaurant is serving meals. That startup is trying to gain a business. Those are not sham entities. Those are entities trying to make a profit. Now, the chances they're profitability may not be high, but that doesn't mean those are businesses. That doesn't mean that they're trying to do something. And that doesn't mean at the end of the day they can't achieve that. Do you think those are good examples for this case, the examples you've just given us? I'm using that example for the purpose of saying that if you're trying to identify a percentage, a probability of success of making money, that people will invest in legitimate, non-contestable businesses that have low percentages of making money. But the difference here, I think, is that, and the tax court found it as a matter of fact, and I think there's plenty of evidence to support it, that your client's motivation for entering into this transaction was, it would be nice if I made a little money, but I really don't care. I'm entering into this transaction subjectively for the purpose of these enormous tax losses. So that's the first part of a two-part test that applies to sham transactions. That doesn't apply in the circumstance we're talking about. Nobody gives money to a restaurant saying, I don't care whether it succeeds or fails. So this is a case where there's a big difference. And I understand there's a potential of gain, but it's a relatively small percentage potential gain. In that circumstance, do we just say it's okay if there's ever any potential of gain? One of the areas that we cited in our briefs, one of the areas that I even, you know, reducing my advocate hat a little bit, I still believe the court erred on, was the assessment that my client didn't have a motivation to make a profit. Well, the court may have erred on that, but we review that one pretty deferentially, don't we? There was a trial. Yeah, there was a trial, and clearly there is deference to that. But you'll notice as you read the evolution of the court's assessment of my client's intent, it starts with this was the predominant factor was taxes. The overriding factor, I think, is the exact word that the court used. Then later on it goes and says the court says that the taxpayer was only motivated by reducing taxes. Now, that's just not true, and there's no evidence really to suggest otherwise. The taxpayer is presented with this investment strategy by KPMG, given materials about the potential profitability of the transactions associated with the purchase of securities and Deutsche Bank stock. They put him in touch with an investment advisor company that's populated by two former KPMG partners and a Ph.D. economist with, I believe, a Harvard and MIT or Harvard and Harvard degree, and the sole purpose is to evaluate the investment side. That's why Presidio is involved in this. So to say that the taxpayer had no desire to make money here, where does that come from? It can't come from, one, his background. He is an entrepreneur. His goal in life is to make money. It can't come from his statements, his credibility. This isn't Blum. Blum, the taxpayer tells the court under oath, I wasn't concerned with the tax ramifications, even though Blum was getting a $40 million benefit. I'm not sure, to me, this is not a particularly useful part of the argument because the tax court was entitled to make a credibility determination. I know what your client said, and I know your client said I wanted to make money, but if I were looking at this transaction as a whole and looking at the risks and the benefits, I think a tax court judge could surely conclude that your client's sole motivation for entering into this transaction was. So the first part of the test, for me, you lose on, the subjective part of the test. My concern is the objective part of the test, which is. Which is 10 to 13 percent or up to 25 percent possibility of making some money on this. And, Your Honor, it distresses me because going into this, if I was a betting person and I'm not, I would have said I want to ride the subjective intent horse. See, and my problem is that's a factual finding by a judge who listened to your client understand, who looked at the entire transaction and said, I know what he says, but when I look at this entire transaction, his sole motivation for getting into it must have been taxes. And I have a hard time overturning that. The way you just articulated, though, if a trial judge says, I've heard all of this evidence and this is what he says, I don't like his demeanor on the stand, and I have reached the conclusion that despite everything he says, his motivation must have been something different. There has to be some evidence to support that must have been something different. And what is the evidence in this case? His testimony, plus these two experts, plus. Plus the testimony from Ms. Bratton, who worked for Presidio and said that these were presented to taxpayers as investment opportunities that could make money. And the documents that were given to him by Kedah. And my skepticism is not to be regarded as a decision. I just wanted to let you know why I found that a hard argument for you. If the balance here is subjective intent, that record to me supports subjective intent in this case. Thank you.  Judith Hagley. Good morning. Judith Hagley from the Justice Department for the Commissioner. May it please the Court. The tax court here applied this Court's precedent to the record of evidence, made numerous factual findings, and none of those factual findings are clearly erroneous. And this Court should affirm, just as the Tenth Circuit affirmed in the Blum case, the case law in the Tenth Circuit and the Ninth Circuit are, the Ninth Circuit's case law is consistent with the other circuits that you mentioned, the Third Circuit and the D.C. Circuit, but it's also consistent with the Tenth Circuit, which just affirmed back in December that the same tax shelter lacks economic subsidies. You don't think that there's a somewhat different standard in the Ninth Circuit than in the Third and the D.C. Circuits, which seem to be the leaders in this area? No. We don't. When the courts talk about there being a split in the circuit, they really identify the Fourth Circuit as sort of being the outlier, that the test as articulated in the Fourth Circuit was that to be disregarded under the economic substance doctrine, you'd have to find that it lacked both business purpose and economic substance, where the other circuits, it's a much more flexible test. And I would point out that the majority view has been codified by Congress for transactions after 2010. But not for this one? No, not for this one. Okay. But this Court's case law is consistent with how Congress has codified the doctrine. Let me ask this. If a profit had been made on this transaction, capital gain or whatever, it would be taxable, wouldn't it? If a profit had been made, it would be. Let's assume that the tax loss, which I'm very skeptical about in this case, I must say. Let's assume that the commissioner disallowed the tax loss on some basis other than sham transaction, but a profit was made on the investment on Deutsche Bank stock. That would have been a taxable gain, would it not? If the transaction were respected under the economic substance doctrine, then the profit would be taxable. Well, but I'm saying if wouldn't even, there's a 20 percent chance or 10 percent chance in this thing that it might make some money and still, in the view of the taxpayer, generate these enormous losses. By happenstance, it didn't make money. It was on the 80 percent side or the 87 percent side. But if it made money, wouldn't it be a real transaction for that purposes? Well, it depends how it was designed. The mere fact that profit coincidentally happened or if it was incidental is not enough. What this court looks at and what other courts look at. No, no, that's not what I'm asking. I know your position. I'm asking, would you tax that profit, wouldn't you? If the transaction had economic substance, yes, the profit. Whether or not it had economic substance. In this case, exactly the same transaction, but for reasons that none of us control, including the IRS, Deutsche Bank stock goes in a different direction than it did. They make some money. Wouldn't you tax that? No, because the transaction would still need to be disregarded under the economic substance doctrine. And both the profit would, the entire transaction. So, okay, let me follow this through. So let's assume the same transaction. And the taxpayer says, wow, I think the IRS's decisions are right. I'm not claiming this $40 million tax loss. But I do have to report the profit I made on my investment on the Deutsche Bank stock. Would you say, don't worry about it. You don't have to do that because the whole thing was a sham? No, well, the taxpayer, and I think this is the Danielson rule that's developed. This is not anything outside my brief. It's bound by the form of his transaction. It's the commissioner that can disregard the form of the transaction and apply the economic substance doctrine. So the commissioner can disregard the form of the transaction, tax the profit, but not allow the. . . No, no, no. But not allow the deduction because it's a sham? No. If the commissioner were to apply the economic substance doctrine, both the profits and the losses are disregarded. They would not tax, say, in this example. . . Because it's a sham. Because it's a sham. Exactly. Because it's a sham. How can it be a sham if at the end of the day, put aside the tax loss for a second, Mr. Redham has more money in his pocket than when he started? Because that's not how the transaction was designed. In fact, the Court had this example in the Sochin. . . I hope I'm saying it correctly. The Sochin case, which was one of the straddle shelter cases, in that case the Court disregarded the transaction under the economic substance doctrine even though it was a small profit. It was like $500 and disallowed the $20,000 loss because the transaction was not designed to create the profit. It was designed to create the loss. And looking at this transaction, it was designed to create this artificial $50 million loss. The leverage that was utilized and was promoted as creating a business opportunity was illusory. It was designed to make the $50 million basis ship from the foreign entity to the U.S. taxpayer. The assets in the transaction were highly, grossly overpriced, which is a . . . Which is a separate problem. I mean . . . But isn't the point that if something incidentally, coincidentally happens to make a profit because the Deutsche Bank stock or whatever goes up a little bit, the point is still, from your point of view, that the entire transaction the way it was structured had no economic substance and that it had no legitimate business purpose. And either or both of those means that it's a sham. Or maybe a . . . I don't know if I'm stating it quite correctly. That's correct. That's correct, Your Honor. That is our position. So the fact that there is a profit . . . Right. Or even that some expert says that I can do the models and there could possibly be a profit. If the series of transactions, including the way it's set up with the foreign entity or person overseas who isn't subject to U.S. taxes and all of these other steps show that there just is no economic substance, it doesn't matter. That's exactly right. And the fact . . . Go ahead. Finish your . . . No, I was just going to say the facts of this case are identical to the relevant facts in the Blum case. It was the same percentage possibility. The mere possibility that profit could occur did not lend substance to the entire transaction because profit was not expected. The expected result in both cases was that there would be a substantial loss. I mean, the stock went up 20 percent and there was still a loss. It was not a matter of the stock going up a little bit. It went up 20 percent. And because the transaction was designed to create the wholly artificial $50 million loss and not a profit, taxpayers still lost. So that's one point. You're going to get rebuttal in a minute. But you list one, two, three, four. What evidence . . . I think the position is that . . . the argument is that it's just an assumption that it was designed as a tax loss. And you can assume whatever you want to assume. The record shows otherwise. What else is there in the record other than this one point to demonstrate that this was intended to be an investment to gain a tax loss? Well, I mean, Redham testified that the Opus transaction was designed to create the $50 million loss, which he said he wanted to sell the stock and trigger that in 1999. If you're asking about what evidence supports the district court's finding . . . I'm not asking you. I just want you to make the points, one, two, three, four, to the extent you can. Absolutely. And we'll hear rebuttals so that they can destroy it if they can. All right. Well, the tax court found, based on a number of facts, that there was no business purpose for this transaction. And what the court looked at was both the timing and the size of the transaction correlated to his tax needs, not to his business needs. The tax court also found that Redham was wholly indifferent to the economic terms of the Opus transaction, failed to investigate their terms, but failed to discover whether the pricing was fair or not. Again, the transaction lost a lot of money because it was overpriced by over $2 million, and he never took any steps to investigate, even though he was advised to do so by KHPNG himself. And I know you're responding to Judge Ferris here, but let me ask you a question about that. Here's what's giving me some difficulty in this case. As I said at the beginning, I can't imagine that these are real losses under 165, which talks about any loss actually sustained during the taxable year. That's correct. And you made that alternative argument below. Yes. But is it necessary that the transaction be a sham in order for you to get there? In other words, part of my problem is that part of this transaction is not a sham. It produces real gains or real losses, but relatively minor. And the rest of the transaction seems to me to be fantastical. And so can we separate the two for purposes of that? Well, you are looking at under the economic substance side, you're looking at the transaction as a whole. So the question is not is it a good idea or was it a good idea to invest a Deutsche Bank stock, because that's not what this transaction was. It wasn't just an investment in Deutsche Bank stock. As the tin circuit explained in Blum, there it was UBS stock, but you could have invested in the foreign bank stock without this apparatus of the swap and the options and the offsetting options that the foreign entity entered into with the foreign bank, which was all set up and designed to create that artificial loss. And there's evidence to the record, there's promotional material from KPMG that was used to design exactly the steps that would need to be taken to create that loss. That is in the record. So that's what you're looking at. And that transaction as a whole lacks economic substance. It wasn't designed to create a profit. It did not create a profit. It was highly unlikely to create a profit, as both of the experts in this case agree. What if it were likely to create a profit? If it were likely? Yes. Let's assume it was likely to create a profit, but not a very big one. Would it still lack economic substance? It still would lack economic substance. As the Supreme Court said at the next case that we cite, the question is did this transaction appreciably improve the taxpayer's economic benefits. And as in the Soshen case, a de minimis profit is not enough. Sal, which was a 10-circuit decision that had a larger artificial loss there, I think it was like $500,000 was the expected profit, and that's not enough. Because, again, the critical fact is that the loss was wholly artificial, and that's how. So the reason it's important that you maintain that position is some brilliant guy someday is going to look at it as an investor. He's going to look at BOCA. He's going to look at all of these cases and come up with a seven-step transaction, and people overseas will say, and we'll put this other little piece in, so that you can actually make a little bit of profit in addition to your $50 million tax avoidance. And if that were enough, this whole house of cards that the case law has created, not out of whole cloth by any means, and that Congress has now codified, would fall by the boards if the least bit of profit were enough. No, and it's not enough. The courts have recognized that. And another question the courts ask is where is the profit coming from? You brought up a good point that someone clever is going to come up with something. You could take one of these elaborate transactions and just transfer into all these other options and swaps and shenanigans just an interest-bearing account. So it's somehow part of the transaction. It earns interest. I'm not trying to be a tax planner here, but you could do that and say, well, that was profitable. No, because you didn't need the rest of that to have that interest-bearing account. You just increased your transaction costs. I'm sorry. I didn't mean to interrupt you. You were asking us to address this in a different way than the tax court did. What the tax court said was the percentage of profit here, the percentage of shares of profit was too low. I mean, as I read its opinion. It says it was 13 percent and maybe it was 25. It's not clear whose it is. But it says under everybody's testimony, the chance of profit was too low. You're asking us to adopt a different one, which is that if the profit, if the potential of profit is really small potatoes next to the tax gain, then we ought to view this as a sham transaction. Actually, I don't mean to be asking. I was just responding to questions. I mean, this case does not raise that question. You think we ought to affirm because the chance was only 13 to 25 percent. Which under this Court's case law is not enough because this Court's case law looks to whether profit was likely. You only get to the other questions. I'm getting back with apologies to Judge Ferris to the question he asked before, which is that lots of people invest in start-ups and restaurants and records and movies, knowing there's only a very small chance of a profit. I'm a little concerned about us saying a transaction is a sham if there's only a tiny chance of a profit on it. So there has to be something else that makes it a sham, doesn't it? Well, the economic substance test is a flexible fact-specific test. So a court would view that type of transaction differently, and it would analyze it in terms of, okay, well, the profit was a high-risk, high-reward type of investment. But was the transaction designed to foster the profitable side of that? You know, was the leverage used in it real or was it illusory, as in this case? Were the assets that were utilized overpriced? I mean, a court can apply common sense. But the general rules and the general normal investment. You're always in dangerous ground when you're asking us to apply common sense. But the general test is looking at, you know, would a reasonable, prudent investor have expected to make a profit? You know, setting aside those, you know, the rare type of high-risk investment of drilling for gold or oil and cyber. Is that really? I mean, I'm not sure it's necessary for you in this case, but people invest maybe not expecting to make a profit here but hoping there's a wild chance that they might. Sure. A reasonable investor might say, I'm never going to put money into a startup because 99 percent of them fail. But when the hundredth one hits, I'm going to get rich. So I'm not sure. Is that the test? That is the test that was articulated by this court and by other courts to apply to just the runner of the bill. And this transaction was not a startup. This is a stable financial stock that was utilized to prop up the tax strategy. Let me ask you the question I asked your opponent at the beginning. Let's assume that we, for some reason, don't uphold the tax court's determination that this was a sham transaction without economic substance. Do we reach the next issue or do we send it back to the tax court for you to urge your. To address that alternative arguments. And the commissioner made a number of alternative arguments, such as whether, you know, Cormer had actually bought the stock. Those are not arguments we can resolve at this point. There would need to be a remand for those. And is it your view that the task court judge didn't implicitly reject any. No, he didn't. In fact, expressly said that there was a lot of merit. He wasn't going to reach it. That happens in economic substance cases. The court doesn't address the technical argument. And as I read your brief, you reserve those arguments. We also we still press those, but that's not what we're arguing. We're not arguing for you to affirm on that basis. All right. If there's any further questions. Thank you. Thank you very much. Why don't we give you a minute of rebuttal since we gave her a little bit of extra time. And since Judge Ferris is dying, you hear your rebuttal. I'm going to focus on the overpricing because the government. I may be dying, but it's not. And I don't want your survival to be dependent on. Eager. Eager. Thank you. It's too big of a burden. We have a diametrically opposed view on the overpricing issue. This overpricing was never disclosed to the taxpayer. This was basically a fraud by fiduciaries on the taxpayer. The money that the taxpayer was paying in terms of fees wasn't enough for KPMG and Deutsche Bank and Presidio. So they decided to take some out on the back end and not make the taxpayer aware of it. Now, if the taxpayer was only in it to get tax benefits, and this was something that was known between the taxpayer and KPMG, KPMG says to the taxpayer, look, you're going to get a $50 million loss. We're going to make a little on the back end. You're not going to have really a big chance to make some profits, so don't worry about valuing these options. You know, this isn't going to be profitable on the investment side. This is going to be really good for you on the tax side. That's not the way this went down. This went down, this was going to be profitable on the investment side, and this was going to generate a tax loss. And this overpricing that sucked out $2.3 million worth of value from Mr. Reddam's transaction, and that was the government's expert, I think that should be credited to Mr. Reddam, not only on the subjective intent side, because it shows that Mr. Reddam would want to make that money, but also on the objective side. I don't think we should penalize Mr. Reddam if his fiduciaries defrauded him and took that money away from him by overcharging. And my analogy here is this. During the 2004, 2005, 6 and 7 timeframe, leading up to the financial crisis that was mainly a function of mortgage-backed securities dropping out, there were very dubious mortgage brokers and appraisers putting people in homes that were assessed at far more value than those homes were worth. And so mortgages went to people who couldn't afford them on homes that didn't have those values. But some of those people stayed in those mortgages and paid those mortgages. And those mortgage deductions are not disallowed by the government on the basis that that house was overpriced, that that mortgage shouldn't be subsidized by the government because it was a fraudulent deal. That was a real thing. It was kind of hard on your opponent when you bring a new argument at the time of rebuttal. That was not a new argument. It's just going to overpricing of the options, which I think is in fact a favor. Maybe you made that argument, but I certainly didn't hear any argument over mortgages. No. I think it is in our favor, Your Honor. And she doesn't get to respond. Thank you, Your Honor. I appreciate the time. The case is submitted. We thank counsel.
judges: Friedman, Farris, Hurwitz